2025 IL App (1st) 241645

FIFTH DIVISION
December 26, 2025

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-24-1645

| | | |
|---|---|---|
| ANDREA MILLER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| FERTILITY CENTERS OF ILLINOIS, S.C.; FERTILITY | ) | No. 21 L 9559 |
| CENTERS OF ILLINOIS, PLLC; APPARENT IVF | ) | |
| INTERNATIONAL, LLC; GAMETE RESOURCES INC.; | ) | |
| CRYOVAULT, INC.; and BRIAN KAPLAN, M.D., | ) | |
| | ) | Honorable |
| Defendants-Appellees. | ) | Jerry A. Esrig, |
| | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1 Plaintiff Andrea Miller sued defendants Fertility Centers of Illinois, PLLC (FCI) (formerly Fertility Centers of Illinois, S.C.) and Brian Kaplan, M.D., as well as the cryogenic defendants (aParent IVF International, LLC (aParent), Gamete Resources Inc. (GRI), and Cryovault, Inc. (Cryovault)), based on their alleged involvement in a legal dispute with her ex-husband over the custody of embryos. On appeal, Ms. Miller challenges the circuit court's dismissal for failure to state a cause of action, under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2018)), of her claims alleging negligence, breach of express and implied contracts, breach of fiduciary duty, and medical battery. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Ms. Miller alleged the following facts in her complaint which, for the purpose of reviewing a dismissal under section 2-615, we take as true. *Bonhomme v. St. James*, 2012 IL 112393, ¶ 34. Ms. Miller first presented to FCI on February 10, 2014, for "a fertility evaluation, egg harvesting, and egg freezing." FCI and Dr. Kaplan provided Ms. Miller with fertility treatments from February through April of 2014, culminating in an egg retrieval procedure on April 11, 2014. Those eggs were cryogenically frozen and stored by FCI and the cryogenic defendants.

¶ 4    On March 14, 2018, Ms. Miller returned to FCI with her then husband, Robert Lyons. She was again evaluated by Dr. Kaplan and began additional fertility treatments, which did not result in a successful pregnancy.

¶ 5    In August 2018, Ms. Miller decided to undergo an in vitro fertilization (IVF) procedure, which uses assisted reproductive technology. In conjunction with the IVF procedure, FCI provided Ms. Miller and Mr. Lyons with an IVF consent form that asked them to "indicate your decisions regarding the elements of IVF treatment you agree to undertake in your upcoming IVF cycle." The FCI consent form contained directions and agreements regarding the following: the components of the IVF treatment, quality control for in-vitro fertilization and embryo culture, disposition of frozen embryos, cryopreserved embryo storage, the death of the patient, the death of the patient's spouse or partner, the simultaneous death of the patient and partner of the patient, divorce or dissolution of the patient/partner relationship, nonpayment of cryopreservation storage fees, and donation of frozen embryos for research purposes.

¶ 6    The section regarding disposition of frozen embryos provided: "[T]hese frozen embryos are subject to the joint control of the couple, except as indicated herein." In referring to "Divorce or Dissolution of Relationship," the IVF consent form provided that, "[i]n the event the patient and her spouse are divorced or the patient and her partner dissolve their relationship, we agree that the

frozen embryos should be disposed of in the following manner," under which the box was checked indicating "Award to patient, which gives complete control for any purpose, including implantation, donation for research, or destruction." The IVF consent form was signed by Ms. Miller as the patient and by Mr. Lyons as her partner and was witnessed by an FCI employee, Lauren Nash, RN, on August 2, 2018.

¶ 7    On September 20, 2018, Dr. Kaplan performed an IVF cycle with Ms. Miller, which did not result in any viable embryos. Ms. Miller continued fertility treatments, and, on December 12, 2018, she underwent a second IVF cycle that resulted in two viable embryos. According to the complaint, "Defendant FCI informed Ms. Miller that only one FCI consent form was necessary for her continued treatment," and no subsequent consent form was provided or signed for this December 12, 2018, cycle.

¶ 8    On January 16, 2019, Mr. Lyons contacted FCI and explained that he and Ms. Miller had separated, he would no longer participate in treatment, and he "would not agree to any further use of the embryos without his in-person consent."

¶ 9    On January 28, 2019, Ms. Miller contacted FCI and requested that it perform the transfer and implantation of an embryo. The next day, FCI informed Ms. Miller that it would need additional consent forms before performing the procedure. On April 11, 2019, FCI told Ms. Miller that it could not proceed without "a document" from the court. In a subsequent conversation, FCI explained to Ms. Miller that its consent forms were typically signed annually by patients and covered their treatments for a full calendar year. In another subsequent conversation, FCI provided Ms. Miller with a list of reproductive law attorneys that could help protect her rights to her frozen embryos.

¶ 10    According to Ms. Miller, "[d]espite the representations of [FCI], the judge in [her] divorce

proceeding *** ruled that the FCI Consent was limited to a single egg retrieval and that it did not cover the December 2018 IVF cycle." As a result, in the view of the judge in the divorce proceeding, the consent form granting Ms. Miller custody of the frozen embryos in the event of her divorce from Mr. Lyons applied only to the unsuccessful September 2018 IVF cycle and not to the embryos resulting from the December 2018 cycle.

¶ 11    On September 27, 2021, Ms. Miller filed a 15-count complaint in this matter. She asserted claims of negligence and breach of fiduciary duty against FCI, the cryogenic defendants, and Dr. Kaplan; intentional infliction of emotional distress against FCI and Dr. Kaplan (claims she omitted from later amendments); medical battery against Dr. Kaplan; and breach of express and implied contract against FCI. Ms. Miller alleged that she had "no ability to access or retain custody of the embryos," that the defendants failed to provide her "with sufficient informed consent forms to ensure she retained custody of her embryos," and that the defendants failed to grant her possession of the embryos "as agreed in the FCI Consent."

¶ 12    On December 22, 2021, FCI and Dr. Kaplan moved to dismiss, arguing that the consent form was not a contract but was merely "documentation that the couple had been explained risks and benefits of the IVF procedures" and only expressed  "the couples' [*sic*] current agreement between each other of what they intended to happen with the embryos in the event of divorce." They also argued that the negligence and breach of fiduciary duty claims against them "[arose] out of the same alleged operative facts" and were, therefore, duplicative.

¶ 13    On December 19, 2022, the circuit court dismissed the counts for breach of contract and intentional inflection of emotional distress without prejudice and denied defendants' motion to dismiss the counts for negligence and breach of fiduciary duty, all "for reasons stated in open court." No transcript of that hearing appears in the record on appeal.

¶ 14    On February 3, 2022, the cryogenic defendants moved to dismiss on the grounds that they "had no involvement, whatsoever, with the fertility treatment and the provision of the consent form to [Ms. Miller]."

¶ 15    On September 13, 2022, the judge in Ms. Miller's divorce case granted her complete control over the embryos for any purpose and stating that Mr. Lyons had no right to, interest in, or control of the embryos. Ms. Miller's divorce from Mr. Lyons was finalized shortly thereafter, on October 13, 2022. On June 1, 2023, the circuit court in this case ordered defendants to provide it with a copy of the divorce court's order related to custody of the embryos and to inform it whether Mr. Lyons had appealed that order. The divorce court's order is also not in the record on appeal.

¶ 16    In her second amended complaint, filed on August 1, 2023, Ms. Miller noted that the judge in the divorce proceedings had entered a final judgment in her favor regarding custody of the embryos and alleged as damages the significant expenses she had incurred to establish that custody.

¶ 17    Count I, for negligence, alleged that FCI:

"a.      Failed to provide Plaintiff with sufficient informed consents to ensure she retained immediate ownership of her embryos in the event of a divorce or other disslolution [*sic*];

b.      Failed to inform Plaintiff that she needed to sign with her then husband additional consents for fertility treatments for each IVF Cycle;

c.      Failed to ensure that its FCI Consent forms were sufficiently detailed to cover all IVF Cycles including all IVF treatment for a full year of treatements [*sic*]; and

d.      Failed to provide sufficient protections for the embryos to ensure Plaintiff's rights were protected in the event of a divorce or dissolution."

The same factual allegations were made against the cryogenic defendants and Dr. Kaplan, in counts asserting claims of negligence and breach of fiduciary duty, but no claim was brought against them for breach of contract.

¶ 18    On December 7, 2023, the court dismissed the negligence, breach of fiduciary duty, and medical battery counts with prejudice "for the reasons stated in open court." A transcript of those proceedings is not part of the record on appeal. According to the court's written order, the claims for breach of contract and breach of implied contract were dismissed without prejudice, "with the caveat that absent an express allegation supported by sufficient facts that any Defendant expressly promised to provide  [Ms. Miller] with a consent form that would preclude and/or prevent subsequent litigation on the issue of disposition of the embryos, these Counts will be dismissed with prejudice."

¶ 19    On January 4, 2024, Ms. Miller filed a third amended complaint. Her amended claim for breach of contract against FCI alleged that it:

> "a.      Failed to provide Plaintiff with sufficient informed consents to ensure she retained immediate ownership of her embryos in the event of a divorce or other disslolution [*sic*];
>
> b.      Failed to ensure that the FCI Consent form covered all subsequent egg retrieval and IVF cycles for Andrea Miller;
>
> c.      Failed to convey ownership of the embryos to Andrea Miller by operation of the FCI Consent form and Agreement with FCI;
>
> d.      Failed to protect the wishes of Andrea Miller and Robert Lyons as outlined and agreed in the FCI Consent Form; and
>
> e.      Failed to provide Plaintiff the embryos as agreed in the FCI Consent;"

Ms. Miller's claim for breach of implied contract against FCI also alleged that it "[f]ailed to provide sufficient protections for the disposition of the embryos to avoid and rebut future litigation as agreed in the FCI Consent and oral Agreement."

¶ 20    Both counts were supported by the following additional factual allegation that had not appeared in earlier versions of the complaint:

> "As part of the terms of the Agreement with FCI, Plaintiff was to be the rightful owner of the embryos in the event of a divorce, and a FCI nurse represented that the FCI consent form was valid for all her treatments and would ensure that Plaintiff was the owner of the embryos in the event of a divorce."

¶ 21    On January 17, 2024, the circuit court struck the third amended complaint "for failing to include an express allegation supported by sufficient facts that any Defendant expressly promised to provide [Ms. Miller] with a consent form that would preclude and / or prevent subsequent litigation on the issue of disposition of the embryos." Pursuant to that order, all counts of the second and third amended complaint were dismissed with prejudice.

¶ 22    On February 15, 2024, Ms. Miller filed a motion to reconsider, which the circuit court denied on July 17, 2024, "[f]or the reasons stated in open Court." Again, the transcript from that court date is not part of the record.

¶ 23    This appeal followed.

¶ 24                              II. JURISDICTION

¶ 25    On July 17, 2024, the circuit court denied Ms. Miller's motion to reconsider its orders of December 7, 2023, and January 17, 2024. Ms. Miller timely filed a notice of appeal on August 16, 2024. This court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), which together govern appeals from final judgments entered by

the circuit court in civil cases.

¶ 26                                    III. ANALYSIS

¶ 27    A section 2-615 motion to dismiss is a challenge to the legal sufficiency of a complaint. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). "The critical inquiry is whether the allegations of the complaint, when considered in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted." *Jarvis v. South Oak Dodge, Inc*., 201 Ill. 2d 81, 86 (2002). Illinois is a fact-pleading jurisdiction, and conclusory allegations alone are insufficient to state a cause of action. *Doe v. Coe*, 2019 IL 123521, ¶ 32. Instead, enough facts must be alleged "to bring a claim within a legally recognized cause of action." *City of Chicago v. Beretta U.S.A. Corp*., 213 Ill. 2d 351, 368 (2004). The court must accept all well-pled facts in the complaint as true. *Wakulich*, 203 Ill. 2d at 228. "Thus, a cause of action should not be dismissed pursuant to section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." *Marshall v. Burger King Corp*., 222 Ill. 2d 422, 429 (2006). Our standard of review is *de novo*. *Id*.

¶ 28    On appeal, Ms. Miller argues that the circuit court erred in dismissing the claims set out in her second and third amended complaints and in denying her motion to reconsider. According to Ms. Miller, defendants breached a duty to her "by failing to provide her with sufficient informed consent, fail[ing] to inform her of the need for additional informed consents, [and] fail[ing] to provide sufficient protections for [her] embryos in the event of a divorce or dissolution." Although Ms. Miller has articulated the breach of various duties and couched those breaches as the basis for assorted causes of action, she has essentially asserted two theories of recovery: one for the drafting of the FCI consent form, which is the focus of her negligence claim, and another for failing to follow the terms of that agreement, which is the essence of her breach of contract claim. We

address each of her claims in turn.

¶ 29                                    A. Negligence

¶ 30    Ms. Miller first argues that the circuit court erred in dismissing her negligence claims. She argues that FCI, Dr. Kaplan, and the cryogenic defendants owed her a duty to draft a consent form that would sufficiently protect her interest in her embryos and failed "to provide sufficient language in their informed consent" to ensure that that interest would be protected. Ms. Miller does not specify what the cryogenic defendants did to breach this duty, since they did not draft the consent form. Rather, she contends that they are liable under an "agency" theory. For the following reasons, we disagree.

¶ 31    To succeed on a claim of negligence, Ms. Miller would need to prove that (1) defendants owed her a duty of care, (2) they breached that duty, and (3) the breach was the proximate cause of her injury. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000). Our supreme court has explained that "the duty analysis must begin with the threshold question of whether the defendant, by his act or omission, contributed to a risk of harm to this particular plaintiff." *Simpkins v. CSX Transportation, Inc*., 2012 IL 110662, ¶ 21. If so, we then weigh the following four factors to determine whether a duty ran from the defendant to the plaintiff to take or avoid action to prevent this harm: (i) the reasonable foreseeability of the injury, (ii) the likelihood of the injury, (iii) the magnitude of the burden of guarding against the injury, and (iv) the consequences of placing that burden on the defendant. *Id*.

¶ 32    According to Ms. Miller, "the solution is relatively simple"—FCI only needed to make clear that its consent form applied to all of her IVF cycle treatments. This change in the consent forms would have avoided the divorce court's initial determination that the consent form only applied to the first IVF cycle.

¶ 33    Ms. Miller did not address in her brief the fact that the consent form also only created an exception to joint control over the embryos in the event of "divorce" or "if the patient and her partner dissolve their relationship." At oral argument, counsel for Ms. Miller suggested that "dissolution" also included her situation because the parties' marriage was in the process of ending. However, in Illinois "dissolution" is another term for divorce. The governing statute is known as the "Illinois Marriage and Dissolution of Marriage Act" (750 ILCS 5/101 *et seq.* (West 2018)) and courts use the terms interchangeably. See *In re Marriage of Tabassum & Younis*, 377 Ill. App. 3d 761, 763, 771 (2007) (dissolution of marriage referred to as divorce and vice versa).

¶ 34    We need not decide in this case whether Ms. Miller would have a claim if the divorce court had never awarded her the embryos, because it did in fact do so prior to the entry of the final order of dissolution. The harm Ms. Miller complains of in this case is the fact that her right to the embryos was challenged and that the challenge delayed her ability to use the embryos. But the impossibility or, at the least, the extreme difficulty of completely protecting Ms. Miller from any challenge to her right to immediate possession of the embryos, defeats any claim that Ms. Miller could have for negligence. As the duty analysis outlined above makes clear, a necessary focus is on the magnitude of the burden placed on the defendant to guard against the injury, and the consequences of placing that burden on the defendant. Here, the magnitude of ensuring that Ms. Miller was impervious to legal challenge was so high that we agree with the circuit court that it could not be placed on any of the defendants.

¶ 35    Ms. Miller correctly points out that there is not a substantial body of case law "addressing the duties and standard of care owed by fertility clinics involved in the rights of ownership, transport, preservation, and handling of human genetic material." The case law that we have found from various state courts reflects the view that clinics' duties to their patients in drafting a consent

10

form or directive for embryos are extremely limited and that the burden remains on the signatories to protect their own interests. See, *e.g.*, *Jocelyn P. v. Joshua P.*, 250 A.3d 373, 381 (Md. Ct. Spec. App. 2021) ("Given the pervasiveness of third-party informed consent agreements, we emphasize that the progenitors—not fertility centers—must expressly and affirmatively designate their own intent."); see also Deborah L. Forman, *Embryo Disposition and Divorce: Why Clinic Consent Forms Are Not the Answer*, 24 J. Am. Acad. Matrim. Law. 57, 100 (2011) (noting that "[s]tandardized clinic consent forms signed prior to treatment present a particularly poor vehicle for ascertaining and expressing the parties' intentions" in part because "[l]egal uncertainties and myriad variations in life circumstances would make drafting even a customized contract between the parties challenging").

¶ 36    We cannot imagine what language in a consent form could have insulated Ms. Miller from any conceivable legal challenge to her custody of the embryos by Mr. Lyons or that would have "ensure[ed] [Ms. Miller] retained immediate ownership of her embryos" in the event of such a challenge. Ms. Miller's only suggestion is that the form should have made clear that it applied to all IVF cycles or that the clinic had a duty to provide a new form at the point that the old form no longer controlled. However, as noted above, a myriad of arguments could still have been made that delayed Ms. Miller's control over the embryos, including the fact that the parties' divorce was not yet final. Ultimately, the divorce judge awarded Ms. Miller custody of the embryos, so the issue here is not the outcome, but the delay. What Ms. Miller believes she was entitled to is a consent form that would have made it impossible for Mr. Lyons to mount any legal challenge to that custody. This is asking the courts to impose a duty on clinics and providers to do the impossible. Ms. Miller cites no case that has recognized such an exacting duty, nor does the recognition of such a duty comport with the kinds of duties that our courts have recognized can

11

give rise to liability for negligence.

¶ 37　Even between an attorney and client, for example, where the duty to draft documents that protect the client is much clearer, we have recognized that imposing a duty to draft a document so ironclad that it would preclude any dispute as to its meaning would not be appropriate. In *Uskup v. Johnson*, 2023 IL App (1st) 220269-U, ¶ 29, for example, we rejected the argument that an attorney's ambiguous drafting of trust documents constituted negligence because it would require "overwhelming speculation" to conclude that a document could have been drafted that either would not have been subject to challenge or that would have resulted in any challenge being "promptly dismissed with little or no cost." (Internal quotation marks omitted.)

¶ 38　Ms. Miller also suggests that she can establish negligence based on a legally recognized "special relationship," giving rise to an affirmative duty to protect another against an unreasonable risk of physical harm. *Simpkins*, 2012 IL 110662, ¶ 20. But courts have only recognized four relationships that give rise to such an affirmative duty: common carrier and passenger, innkeeper and guest, custodian and ward, and possessor of land who holds it open to the public and member of the public who enters in response. See *id* ¶ 20. Clearly none of those apply here.

¶ 39　Ms. Miller's claims against the cryogenic defendants, based on breach of the same duties, fail because she has not alleged that any cryogenic defendant drafted the consent agreement, was able to provide input into the drafting of the consent form, or was even privy to any of the alleged representations made to Ms. Miller about the consent form. As to these defendants, Ms. Miller's claim fails to get past the initial threshold of whether the defendant, "by his act or omission, contributed to a risk of harm to this particular plaintiff." *Id.* ¶ 21. Ms. Miller has alleged no act or omission of these defendants that contributed to the risk that she would be harmed by her husband's decision to contest her right to the embryos.

¶ 40                                B. Breach of Contract

¶ 41    We next address Ms. Miller's claims for breach of contract. These are brought only against

FCI. To properly plead a breach of contract, Ms. Miller was required to allege: (i) the existence of

a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by

the defendant, and (iv) resultant injury to the plaintiff. *Babbitt Municipalities, Inc. v. Health Care*

*Service Corp.*, 2016 IL App (1st) 152662, ¶ 27. An implied contract is created through the parties'

actions and implied from the facts and circumstances, rather than expressed orally or in writing.

*Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126, ¶ 59.

¶ 42    On appeal, Ms. Miller argues that the FCI consent form and representations made by FCI

constituted a valid and enforceable agreement; that she performed by paying for IVF services; that

FCI breached the agreement "by failing to provide [Ms. Miller] ownership of the embryos, failing

to protect [Ms. Miller] as outlined in the FCI Consent, failing to provide a sufficient consent form;

and that [Ms. Miller] was injured through her not receiving ownership over the embryos." It

appeared from the briefs on appeal that Ms. Miller's position was that the consent form ultimately

gave her the right to the embryos. At oral argument, she argued instead that the consent form did

not apply at all to the second round of IVF treatment resulting in a viable embryo but that the

consent form should be considered together with the statement by the nurse who was alleged to

have told her that it applied to all IVF treatments.

¶ 43    FCI argues that the consent form was an agreement "solely between [Ms. Miller] and her

husband as to who would have the right to possess the embryos in the event of a divorce" and that

it did "not represent an express or implied contract between FCI and [Ms. Miller]." There appears

to be some support, at least in other states, for Ms. Miller's contention that FCI was contractually

bound by the consent form. See *Bilbao v. Goodwin*, 217 A.3d 977, 989 (Conn. 2019) (finding a

standardized checkbox agreement on disposition and storage of embryos to be enforceable against fertility clinic).

¶ 44    However, assuming, without deciding, that FCI was bound by the consent form and that the nurse's oral statement also bound FCI and extended the consent form to the later round of IVF treatment, Ms. Miller has not properly alleged that FCI breached any term of that consent form. Even if the consent form applied to the second round of IVF that produced the viable embryo, there was no language in the agreement that addressed what was to happen when a party initiated divorce proceedings, only what would happen when they were divorced, nor was there any language that protected Ms. Miller from her husband contesting her right to the embryos. In short, there was no allegation of any promise—express or implied—by FCI to protect Ms. Miller from what occurred in this case.

¶ 45    The circuit court made clear to Ms. Miller what she would have to allege to properly state a breach of contract claim: an allegation of an express promise by FCI to "provide the plaintiff with a consent form that would preclude and/or prevent subsequent litigation on the issue of disposition of the embryos." The only allegation that comes close to this is Ms. Miller's allegation that an FCI nurse represented to her that the "consent form *** would ensure that [Ms. Miller] was the owner of the embryos in the event of a divorce." This alleged representation by the nurse, even if it could give rise to a contract that bound FCI, was simply not a promise to prevent a challenge to Ms. Miller's control over the embryos and cannot support her claim for breach of contract.

¶ 46                                C. Breach of Fiduciary Duty

¶ 47    Ms. Miller also asserts a claim  that FCI, Dr. Kaplan, and the cryogenic defendants breached fiduciary duties owed to her "by failing to ensure her ownership of the embryos and failing to provide additional consent forms." This claim fails for a number of  reasons.

14

¶ 48     First, Ms. Miller's breach of fiduciary duty claims are supported by the same operative facts and assert the same injury as that pled in her negligence counts. While pleading in the alternative is generally permitted, duplicate claims in the same complaint are not. *Neade v. Portes*, 193 Ill. 2d 433, 445 (2000). This court and our supreme court have repeatedly looked to the operative facts and injury alleged to determine whether a claim for breach of fiduciary duty duplicates a negligence or malpractice claim. See *id.* (affirming the dismissal of a breach of fiduciary duty claim because it was duplicative of a medical negligence claim); *Majumdar v. Lurie*, 274 Ill. App. 3d 267, 273-74 (1995) (affirming the dismissal of a breach of fiduciary duty claim because it was duplicative of a legal malpractice claim). While we were able to distinguish the negligence claims as focusing on the drafting of the consent forms and the breach of contract claim as focusing on FCI actions after the drafting, here the breach of fiduciary duty claims clearly duplicate the other claims. As to the breach of fiduciary claims, the operative facts—those facts that are alleged to have actually caused the plaintiff's injuries (*Neade*, 193 Ill. 2d at 443)— are the same as her other claims: she was provided a consent form that she asserts was insufficient to shield her interest in her embryos from legal challenge. Also duplicative of other claims is her injury—that she suffered delay and costs in having to establish custody of her embryos in court. Accordingly, we find her breach of fiduciary duty claims duplicative.

¶ 49     Ms. Miller's breach of fiduciary duty claims fail for the additional reason that she failed to allege that any of the defendants derived a selfish benefit from retaining her embryos. A fiduciary relationship can exist by reason of friendship, agency, or business association, and is usually characterized by one party having significant dominance and superiority over another. *Tully v. McLean*, 409 Ill. App. 3d 659, 681–82 (2011). This relationship imposes a general duty on the fiduciary to refrain from "seeking a selfish benefit during the relationship." (Internal quotation

marks omitted.) *Neade*, 193 Ill. 2d at 440. Ms. Miller has simply not pled that any of the defendants sought any such selfish benefit (something that either was for their own use or materially benefitted them (*Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 12)) in providing her with the consent form or in not immediately releasing custody of the embryos to her. In addition, as for the cryogenic defendants, Ms. Miller has pled no relationship at all beyond the fact that they froze and stored her eggs in 2014.

¶ 50                                                    D. Medical Battery

¶ 51    Ms. Miller's final claim is for medical battery against Dr. Kaplan. According to Ms. Miller, "While [she] did consent to the initial procedure, she would not have done so for the second procedure knowing the embryos' custody was not protected." A medical battery case is characterized by either "a total lack of consent to the procedure performed, that the treatment was contrary to the patient's will, or that the treatment was at substantial variance with the consent granted." *Curtis v. Jaskey*, 326 Ill. App. 3d 90, 94 (2001). Ms. Miller's claim here is apparently based on substantial variance.

¶ 52    However, her complaint fails to allege such a variance. As drafted, the consent form expressed that in the event of a divorce or dissolution, custody of the embryos would be granted to Ms. Miller. Ultimately, it was. To the extent Ms. Miller suggests that the consent form she signed was inadequate because it did not convey to her the risk that this outcome might follow protracted litigation, as discussed above, no defendant was under a duty to provide Ms. Miller with an unassailable consent form and any defects in the consent form would not support a claim for medical battery.

¶ 53                                                    E. Motion to Reconsider

¶ 54    Finally, we reject Ms. Miller's argument that the circuit court erred in rejecting her motion

to reconsider. "The purpose of a motion to reconsider is to bring to a court's attention: (1) newly discovered evidence, (2) changes in the law, or (3) errors in the court's previous application of existing law." *Liceaga v. Baez*, 2019 IL App (1st) 181170, ¶ 25. Here, Ms. Miller simply reasserted her aforementioned arguments, which, for the reasons discussed above, fail.

¶ 55                                IV. CONCLUSION

¶ 56    For the foregoing reasons, we affirm the circuit court's dismissal with prejudice of Ms. Miller's claims for failure to state a claim on which relief could be granted.

¶ 57    Affirmed.

*Miller v. Fertility Centers of Illinois, S.C.*, 2025 IL App (1st) 241645

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-L-9559; the Hon. Jerry A. Esrig, Judge, presiding. |
| **Attorneys for Appellant:** | James A. Karamanis and Kenneth A. Nazarian, of Barney & Karamanis, LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Hugh C. Griffin, Jacob Z. Goldstein, Krista Luzio, and Stevie A. Starnes, of Hall Prangle LLC, of Chicago, for appellees Fertility Centers of Illinois, S.C., Fertility Centers of Illinois, PLLC, and Brian Kaplan.<br><br>Julie A. Teuscher and Patrick Creagh, of Cassiday Schade LLP, of Chicago, for appellees aParent IVF International, LLC, Gamete Resources, Inc., and Cryovault, Inc. |